IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CASE NO: 06-21790CA-01(21)

AG GROUP INVESTMENTS, LLC, a
Florida Limited Liability Company,

    Plaintiff(s),

vs.

ALL REALTY ALLIANCE CORP., a
Florida Corporation, et al.,

    Defendant(s).
_____/

DEPOSITION OF DETECTIVE EDWARD HILL
Pages 1 - 39

Thursday, September 30th, 2010
2:12 p.m. - 2:51 p.m.
20803 Biscayne Boulevard - Suite 300
Aventura, Florida

Stenographically Reported By:
ANGELA R. KEYES, FPR
Florida Professional Reporter

## Page 2

```
 1              APPEARANCES
 2   On behalf of the Plaintiff(s):
     GINNIS & GROYSMAN, P.A.
 3   101 Northeast 3rd Avenue - Suite 1100
     Fort Lauderdale, Florida 33301
 4   (954)712-0505
     BY:  ROMAN GROYSMAN, ESQUIRE
 5
 6
 7   On behalf of G&G Property Investments, LLC, Oleg Firer
     and Karina Firer:
 8   MICHAEL I. BERNSTEIN, P.A.
     1688 Meridian Avenue - Suite 418
 9   Miami Beach, Florida 33139
     (305)672-9544
10   BY:  BRIAN G. WINGER, ESQUIRE
```

## Page 3

```
 1              INDEX OF PROCEEDINGS
 2
     Deposition of DETECTIVE EDWARD HILL      Page
 3      DIRECT BY MR. GROYSMAN . . . . . . .    4
        CROSS BY MR. WINGER . . . . . . . . .  34
 4      REDIRECT BY MR. GROYSMAN . . . . . .   36

10              EXHIBIT INDEX
11                                            MAR
     Plaintiff's
12    A    Incident Report                     37
```

## Page 4

```
 1   Deposition taken before Angela R. Keyes, Florida
 2   Professional Reporter and Notary Public in and for the
 3   State of Florida at Large in the above cause.
 4                    * * * * *
 5        THE COURT REPORTER:  Do you swear or affirm the
 6   testimony you are about to give will be the truth, the
 7   whole truth, and nothing but the truth?
 8        THE WITNESS:  Of course I do.
 9        MR. WINGER:  Let me just object before you start
10   to this entire deposition.  It is prejudicial to
11   Mr. Firer and G & G Property Investments.
12        MR. GROYSMAN:  Thank you for that.
13   THEREUPON:
14              DETECTIVE EDWARD HILL
15   having been first duly sworn, was examined and testified
16   as follows:
17              DIRECT EXAMINATION
18   BY MR. GROYSMAN:
19        Q.  Sir, can you please state your name for the
20   record.
21        A.  Detective Edward Hill.
22        Q.  And what do you to for a living, sir?
23        A.  Violent crimes, homicide investigations.  Been so
24   employed for the past 25 years now.
25        Q.  And you are a detective with which agency?
```

## Page 5

```
 1        A.  North Miami Beach.
 2        Q.  And before we proceed let me just introduce
 3   myself.  My name is Roman Groysman and I'm the attorney
 4   for the plaintiff in this matter, the plaintiff being AG
 5   Group Investments, LLC.
 6        Detective, I assume you have been deposed
 7   numerous times before; is that correct?
 8        A.  Yeah.
 9        Q.  A few times?
10        A.  That's fine.
11        Q.  And I'm sure you know the ground rules.
12        A.  Stop sending those checks because we don't cash
13   them.
14        Q.  The $7 witness checks?
15        A.  Yes.
16        Q.  Okay.  I'm sorry.  I will tell my paralegal.
17        Before we proceed, even though I'm sure you heard
18   this a million times before, let me just lay some ground
19   rules really quick.  Obviously I'm going to ask you some
20   questions here.  Just going to ask you to respond
21   affirmatively so Madam Court Reporter can take down your
22   answers with a yes or a no or a sentence.  Is that
23   understood?
24        A.  Yes.
25        Q.  And if you need a break just let me know.
```

**Page 6**

1  A. I don't need a break.
2  Q. Is there any reason why your deposition should
3  not be taken here today?
4  A. No.
5  Q. Okay. I am interested -- I would like to ask you
6  a few questions about a company by the name of All Realty
7  Alliance Corp.
8  A. Okay.
9  Q. Are you familiar with that entity?
10  A. I have heard that and I have seen that entity
11  before.
12  Q. Okay. Did you ever have an occasion to
13  investigate that entity?
14  A. Well, I investigated Natalia and Victor Wolf, and
15  then I -- later during that investigation I found out they
16  owned that real estate company, they were involved with
17  that real estate company.
18  Q. Okay. So let me ask you this. You are aware of
19  the fact that an individual by the name of Natalia Wolf
20  was a principal of a company called All Realty Alliance
21  Corp.?
22  A. Yes. She had a lot of companies under her.
23  Q. I'm specifically talking about All Realty
24  Alliance Corp.
25  A. Yes.

**Page 7**

1  Q. How did you come about investigating Ms. Wolf?
2  A. There was a guy who came -- called in a complaint
3  that he had bought some property in Ocala area, Citrus
4  Springs, and apparently the -- Natalia Wolf real estate
5  office was in North Miami Beach.
6  Q. Okay. And what year was that that you began to
7  investigate Ms. Wolf?
8  A. 2006.
9  Q. Okay. Do you remember the exact month that you
10  for the first time began to investigate Ms. Wolf?
11  A. It was in October, around October. Around the
12  18th of October, or 19th.
13  Q. And did you ever come into physical contact with
14  an individual by the name of Natalia Wolf?
15  A. Yes, I did.
16  Q. Do you recall the exact date when you came into
17  contact for the first time with a Ms. Natalia Wolf?
18  A. You know what, I don't have exact date. I know
19  it was on a Friday. Either it was the 6th -- October the
20  6th or either October the 13th. It's one of those days.
21  Because this gentleman came -- actually it wasn't in our
22  jurisdiction because it was -- it should have been Ocala.
23  And I understand later there was an investigator up there
24  handled it.
25  But he called us, North Miami Beach Police

**Page 8**

1  Department. He said he gave money to the developer to
2  build a house and they didn't do it, you know, and he has
3  been on them for months. And I told him he need to go to
4  Ocala. Well, he just happened to be here in North Miami
5  Beach, so out of courtesy I met with him and he told me,
6  oh, the real estate office is in North Miami Beach, but he
7  gave them money in Ocala in their office where the
8  transaction occurred.
9  Q. When you are saying he gave them money, who did
10  this individual give money to supposedly?
11  A. To a Natalia Wolf. But he wrote a check to her
12  company.
13  Q. Let me ask you a specific question. Do you have
14  a way maybe afterwards when you come back to your office
15  of determining the exact date that you came into physical
16  contact with Ms. Wolf for the first time?
17  A. No, I don't, because everything I had was given
18  to the FBI. We had like 40 something boxes of stuff.
19  Q. Including your notes?
20  A. Yeah. Everything was given to the FBI. I have
21  here for you a copy of an offense incident report that our
22  officers wrote, and all of the -- some of the alleged
23  victims in there who turned out later in our
24  investigation, found out they are not really victims.
25  They made reports on how badly they were ripped off by

**Page 9**

1  Natalia Wolf also.
2  Q. Okay. And let me ask you this, sir. The date of
3  this incident investigation report is what exactly? Take
4  a look for me.
5  A. October the 18th.
6  Q. Of which year?
7  A. '06, 2006.
8  Q. And working your way backwards, are you able to
9  tell me whether you would have met Ms. Wolf for the first
10  time prior to the date of this incident report?
11  A. Yeah. Around the 6th -- either October the 6th
12  or October the 13th as I recall. I don't remember the
13  exact date because when he called me there was no report.
14  I told him it's not in our jurisdiction.
15  Q. So are you fairly confident that at the latest
16  you would have met Ms. Wolf for the first time would have
17  been something like October 13th, 2010? Is that a fair
18  statement?
19  MR. WINGER: 6th.
20  A. Either the 6th or the 13th as I recall. That's
21  2006.
22  BY MR. GROYSMAN:
23  Q. I understand, sir. With October 13th technically
24  being the latest date that you would have met her; is that
25  correct?

10

1  A. Yes, I believe so.
2  Q. But definitely prior to October 13th, the date of
3  this incident report?
4  A. Yeah. Because the report was filed later on.
5  Q. After the preliminary investigation?
6  A. Yes. After they had already deliberately fled
7  and left. That's what I recall.
8  Q. Okay. So let me ask you this, sir. At the time
9  this incident report was made, October 18th, 2006 is it
10 or --
11 A. 2006.
12 Q. 2006. Okay. Do you know what the whereabouts of
13 Ms. Natalia Wolf was?
14 A. No. I heard -- hearsay. I heard that she --
15 they left and went -- flew to New York on Delta Airlines
16 and from there they went to Germany.
17 Q. Ms. Wolf was a resident of North Miami Beach; is
18 that correct?
19 A. Yes.
20 Q. Are you aware of where exactly she lived in North
21 Miami Beach?
22 A. Yes. I don't know the exact address.
23 Q. Was it Eastern Shores?
24 A. Eastern Shores area. I think it was 167 Street.
25 Q. Right.

11

1  A. I don't have the exact house.
2  Q. Do you recall the address of 3265 Northeast 167th
3  Street, North Miami Beach?
4  A. That could be it. I know it's on 167 Street.
5  That could be it.
6  Q. To the best of your knowledge at the date of this
7  incident report on October 18th, 2006 was Ms. Wolf
8  physically still living in the state of Florida?
9  A. No. I think she was gone by then. By the time
10 this guy files the report, I think she left.
11      See, if I had a calendar to go back -- I know the
12 guy came to my office either the 6th -- because she gave
13 him a check on a Friday. I believe the 6th or the 13th
14 had to be a Friday. And that following Monday, that's
15 when she was gone.
16      He tried to cash the check on Monday and she told
17 him just wait until the money in the bank. So he went to
18 the bank on Monday and the check was no good. He called
19 us and we went out to her property and she was gone.
20 Q. So let me ask you a couple of questions here just
21 so we can have a clear record. Is it your testimony today
22 that sometime in October 2006 you were contacted by an
23 individual complaining about the activities or the alleged
24 activities of Ms. Natalia Wolf?
25 A. Yes.

12

1  Q. And is it your testimony today that shortly after
2  that complaint was made to you by this individual
3  Ms. Natalia Wolf fled -- physically fled the state of
4  Florida?
5  A. Yes.
6  Q. And is it your testimony today that Ms. Natalia
7  Wolf physically fled the State of Florida prior to the
8  date of this incident report, which is October 18th, 2006?
9  A. Yes.
10 Q. Okay. And you know this from personal knowledge?
11 A. Yeah -- Well, yeah, I was there at the house.
12 You are talking about 2006. Best I can recall I went to
13 her house -- no, her office first and we saw the doors
14 were open and papers were all over the place. So then we
15 went to her residence and her residence we went in the
16 rear door because the people saying that -- some people
17 were leaving the office. They was taking -- There were
18 people walking out with computers and everything, you
19 know.
20      And so they said that she -- we needed to go to
21 her house because she may be deceased. Somebody said
22 that, you know, because some bad people were looking for
23 her. So we go to her house and the front door was
24 locked. We walk around; you can see in her sliding glass
25 door. You see paper and clothes and stuff strewed about

13

1  the floor.
2       So the back door was open. We go in, we check
3  the house and make sure nobody is there, you know. And
4  there were a lot of clothes and a lot of TVs -- a lot of
5  stuff still left there like somebody just packed a bag and
6  left in haste. There were dozens of champagne bottles in
7  the kitchen area.
8  Q. Do you remember the names of the individuals who
9  first contacted you and complained about Ms. Wolf's
10 business activities?
11 A. No, I don't, because -- I referred them to
12 Ocala. It was a gentleman. You know what, I might have
13 a -- Wait a minute. Let me see something here. Because
14 that guy -- I might have referred him to -- I don't think
15 he filed a police report either, not with us. I don't
16 remember that guy name.
17     MR. GROYSMAN: Give me one second. Can we just
18 ask you to make a copy of the police report while I'm
19 looking for --
20     THE COURT REPORTER: Sure. No problem.
21     THE WITNESS: No, no, you can have it.
22     THE COURT REPORTER: Do you need another copy
23 though?
24     MR. GROYSMAN: You want when you order the --
25     MR. WINGER: A copy comes with the transcript so

14

1 I don't need one right now.
2 THE WITNESS: I don't remember that guy name. He
3 never filed a report with us.
4 Keep in mind now, technically it wasn't our
5 jurisdiction so we didn't really initiate anything
6 because it happened in Ocala area.
7 MR. GROYSMAN: Yeah, I understand.
8 BY MR. GROYSMAN:
9 Q. So the bottom line is sometime in the early of
10 October 2006 you were contacted by an individual or
11 individuals who were complaining about Ms. Natalia Wolf's
12 business activities; is that correct?
13 A. Correct.
14 Q. You then went out to meet with Ms. Natalia Wolf
15 physically; is that right?
16 A. Yes.
17 Q. And how soon after that call -- the complainant's
18 call did you go out there to meet with Ms. Wolf
19 physically?
20 A. Prior to the 6th or the 13th, one of those dates.
21 Q. Of October 2006?
22 A. Of October 2006, which was on a Friday, one of
23 those dates. He came in probably that -- either one of
24 those two weeks on like a Monday or a Tuesday.
25 Q. He being who?

15

1 A. The gentleman who was complaining about his
2 property in Citrus, that she took a check and he paid her
3 money and she didn't construct it.
4 And that particular gentleman asked me -- and out
5 of courtesy, I went -- dropped what I was doing and went
6 out to the office to talk to her.
7 Q. Okay. You went out to her business office?
8 A. Her business office in North Miami Beach.
9 Q. I'm sorry. Let's speak one at a time so the
10 record is clear.
11 Where was that business office located? Do you
12 know?
13 A. It's in the Eastern Shores area off of 163rd
14 Street. Probably like 34 something. I don't know the
15 exact address. 34 so and so on Northeast 163 Street.
16 Q. Let me actually show you a picture. I don't know
17 if this will refresh your recollection. Does this look
18 like the gentleman who contacted you?
19 A. No.
20 Q. No. Must be another one.
21 A. It was a younger guy.
22 Q. All right. So you went out there sometime around
23 October 13th, 2006 to physically meet with Ms. Wolf in her
24 business office?
25 A. No, no, no. The 6th and the 13th, either one of

16

1 those dates is the date that she gave this gentleman a
2 check. It had to be that week of, maybe a Monday or
3 Tuesday. I don't have a calendar that far back. Do you
4 follow what I'm saying?
5 Q. Okay. I understand.
6 A. And I gave you those two dates. I'm not certain
7 which date it is. But either that Monday or Tuesday I
8 went over there out of courtesy. Because he wasn't even
9 in town. It was the phone call he made.
10 (Mr. Groysman looks at calendar.)
11 Q. We are dealing with October, right?
12 A. The 6th, yes.
13 Q. There we are. Looks like the 13th was a Friday.
14 A. Yep, told you it was on a Friday.
15 Q. The 6th was a Friday as well.
16 A. Okay. There you go. It had to be one of those
17 days. Had to be on a Friday. And I would never write a
18 report because it wasn't our jurisdiction. I referred
19 him. But I know it had to be one of those days.
20 Q. So the 6th and 13th would have been when the
21 complaining victim would have contacted you for the first
22 time?
23 A. No.
24 Q. No. That's when she would have given him the
25 check?

17

1 A. She gave him a check and told him to hold it, you
2 know, and don't cash it because the money not in the
3 bank.
4 Q. Oh, I see.
5 A. And so he didn't go that Friday, he went that
6 Monday. She told him to hold it until Monday, but Monday
7 they were gone. And he went to the bank and they said
8 there is no money in the account.
9 Q. And he contacted you before she gave him the
10 check?
11 A. He initially contacted me on the phone either one
12 of those dates - the week of, like a Monday or Tuesday via
13 telephone, and then I eventually spun out and talked to
14 her and she said, oh, I will just give him his money
15 back. So everybody was happy.
16 Q. Okay. Then you said you went physically looking
17 for her at her house in Eastern Shores?
18 A. Yeah. Because he told me on Monday -- that
19 Monday, I don't know what time in the day - maybe before
20 lunch - he say, hey, this check is no good.
21 Q. Bounced?
22 A. And I went to her office -- No, they didn't cash
23 it. He went straight to the bank. And he say he went to
24 her office and when he got in the office they said people
25 were walking in and out of there with stuff. She was

Page 18

1 gone.
2 Q. Do you remember roughly when would have been the
3 first time that you would have gone to Ms. Wolf's private
4 residence to search for her?
5 A. Yeah. That Monday -- I went to the house that
6 Monday. Either the 6th or the 13th was a Friday.
7 Q. So that would have been either on Monday the 9th
8 or Monday the 16th?
9 A. Roughly, yeah. It was one of those days.
10 Q. Of October 2006?
11 A. Correct.
12 Q. And what did you find at Ms. Wolf's house over
13 there in Eastern Shores?
14 A. Well, the house looked vacant, I mean, when you
15 first walk up. We went around the rear, and you can look
16 in and it still was fully furnished. The back door was
17 ajar and we went inside. We saw champagne bottles all
18 over the place and we saw clothes.
19 Q. When you say we, you went there by yourself?
20 A. No, me and Sergeant Gary Kogan, because he is
21 Russian.
22 Q. Gary Kogan?
23 A. Yeah. In case we run into somebody, language
24 barrier, we know we cover our bases. So we went in there
25 and we didn't see her or nobody, because somebody was

Page 20

1 would think somebody was still living there.
2 Q. But was anybody living there?
3 A. Well, I talked to the neighbors. They were there
4 the night before they told me.
5 Q. Okay.
6 A. And far as they know they didn't know they had
7 left.
8 Q. Were the Wolfs there the day you visited the
9 house?
10 A. No. No, sir.
11 Q. Not a Ms. Natalia Wolf?
12 A. No.
13 Q. Not a Mr. Victor wolf?
14 A. No, sir.
15 Q. Did you find anybody in the house, any living
16 being?
17 A. No.
18 Q. What about thereafter, did you continue to look
19 for Ms. Wolf?
20 A. Yes.
21 Q. And were you able to find her?
22 A. No.
23 Q. Okay. So after your first visit to Ms. Wolf's
24 house in Eastern Shores, ever since that date have you
25 been able to locate Ms. Wolf's physical location?

Page 19

1 saying she live around the corner when we was at her
2 office. We didn't know that. And they said it was some
3 people, real bad people looking for her.
4 Q. Do you know if Sergeant Kogan would have any
5 notes on the dates or --
6 A. No. He didn't really get involved. I request he
7 go to the house with me in case they were there and they
8 spoke Russian. And that's all he did. He went to the
9 house with me. We went and checked the house and then he
10 went back to the station because the house was empty so we
11 left.
12 Q. So is it fair to say that what you are saying is
13 that it would have been either Monday -- looking at this
14 calendar would have been either Monday, October the 9th or
15 Monday, October the 16th that you visited Ms. Wolf's
16 residence in Eastern Shores and found that residence to be
17 vacant?
18 A. Best I can recall, yes.
19 Q. Okay. And did you find anybody living at the
20 residence in Eastern Shores on 167th Street?
21 A. No. No. The house was fully -- You would think
22 someone lived there. The house was fully furnished. They
23 had a nursery with a crib in it. Everything was still
24 there. Some clothes -- You see some clothes on the floor,
25 kitchen had food and champagne bottles all over it, so you

Page 21

1 A. No. Or Mr. Wolf.
2 Q. And do you know whether Ms. Wolf is currently in
3 the continental United States?
4 A. No. Last I heard she caught a Delta flight to
5 New York, from New York to Germany. That was in 2006.
6 Q. I don't know if you know anything about this, but
7 do you know if there was a forwarding address left at the
8 Eastern Shores residence for Ms. Wolf?
9 A. No, I don't know anything about that. It was?
10 Q. No, I'm asking you.
11 A. Oh. I doubt it. If it was we need to have it.
12 Q. Yeah. If there was you would have found them,
13 right?
14 A. We want to send her a birthday card.
15 Q. Let me ask you this. To the best of your
16 knowledge is Ms. Wolf a fugitive?
17 A. Oh, absolutely.
18 Q. Okay. Is she being sought after? Is she a
19 person of interest to law enforcement?
20 A. Yes.
21 Q. For what purpose?
22 A. For what purpose?
23 Q. Yeah. Why is she being --
24 A. For this Ponzi scheme, grand theft.
25 Q. Okay. Which law enforcement agencies are looking

## Page 22

1  for Ms. Wolf?
2  A. Well, the federal government is looking for her
3  now because the jurisdiction was too much for local. I
4  don't know if Ocala is still looking for her. I'm certain
5  they got warrants out for her too.
6  Q. Can you give us an idea of what exactly Ms. Wolf
7  is suspected of having committed, if anything?
8  A. I can tell you what she did, not what she is
9  suspected of.
10  Q. Okay.
11  A. She scammed people. She did a Ponzi scheme. She
12  would -- and I know for a fact she paid X amount of
13  thousands of dollars for lots, 500 lots in Ocala. She did
14  it out of her real estate office here. And she sold those
15  lots to several individuals, gave counterfeit deeds, and
16  she recorded it.
17      If she sold it to ten people, the tenth person
18  got recorded. The other people -- nine got fake deeds or
19  deeds with stamps on them. And those individuals wouldn't
20  know until they didn't get they tax bill. So there had to
21  be a concerted effort from December until October to do
22  all that sales and transactions, because in November you
23  get a tax bill.
24      And it was really consistent and funny that they
25  left around that time in November, because taxes started

## Page 23

1  coming out and people already start calling, hey -- and
2  people had already start calling and saying, hey, I
3  haven't got nothing on my taxes. And that's how things
4  start unraveling. And they say, whoa, you don't own the
5  property. And the clerk's office said so and so owns the
6  property. And then everybody start -- look at all these
7  victims in here.
8  Q. Let me ask you this way. Is Ms. Wolf suspected
9  of having sold property to people -- the same property
10  multiple times?
11  A. Yes. I even had individuals tell me that she
12  called them back to buy the property back from them at a
13  $5,000 difference, you know.
14  Q. In other words, Ms. Wolf sold individuals
15  property that she really did not even own?
16  A. No, she owned the lots.
17  Q. Okay.
18  A. And she sold them. She got a loan from the bank,
19  and she sold them to let's say ten individuals. The tenth
20  person she recorded.
21  Q. She would sell the same lot to ten different
22  individuals?
23  A. Yes.
24  Q. And would give them -- most of them fake deeds?
25  A. Fake deeds, fake deeds, yeah. And at the same

## Page 24

1  time those nine people -- She really retained the actual
2  deed. They thought they had a deed. On the tenth person
3  she sold it to them and then she would eventually go back
4  to that tenth person and try to give them $5,000 more than
5  what they paid for it to get it back from them. Some
6  people sold it back to her, some people didn't.
7  Q. Okay. And to the best of your knowledge do you
8  know whether Ms. Wolf engaged in this type of activity
9  through or by a related entity called All Realty Alliance
10  Corp.?
11  A. Yes. And Sky Group -- Sky Development Group.
12  Q. In other words, Ms. Wolf operated through a
13  number of different incorporated entities?
14  A. Yes.
15  Q. Do you know an entity by the name of G & G
16  Property Investments, LLC?
17  A. Yes. I have seen documents with her name on that
18  tied in with that same company. And I had like -- we had
19  like 40 boxes of documents that now has been given to the
20  FBI. I have seen agreements with G & G where they were
21  both on the same line buying other properties or doing
22  other things.
23  Q. In other words, to the best of your knowledge
24  based on your investigation you believe that Ms. Wolf and
25  G & G Property Investments, LLC were in business together?

## Page 25

1  A. Well, I have seen documents. If they were true
2  documents I don't know. I just seen what we found in the
3  office.
4  Q. Did you ever -- I don't know if you were involved
5  in this. Did you ever take a look at the chain of
6  recorded instruments that were recorded on the house in
7  Eastern Shores in which Ms. Wolf left? Did you ever look
8  at the title of that particular house?
9  A. I didn't look at the title, but I think the State
10  of Florida did when they arrested Oleg at the closing.
11  Q. You mean Oleg Firer?
12  A. Yeah. When he got arrested for that closing.
13  But I do know for a fact during the course of the
14  investigation making phone calls we found out it was like
15  maybe three or four people had liens on that property.
16  But not only that, there was a property in Sunny Isles, a
17  condo that Natalia Wolf had, and apparently she said she
18  had a lien -- somebody had a lien on it for $300,000.
19      And that person said that he never gave her that
20  money and he wanted to file a complaint against her too.
21  And she had a lien on the property and had like two or
22  three different liens on it.
23  Q. In other words, Ms. Wolf had a lien on property
24  even though the title owner did not owe her any money?
25  A. Yeah. And the girl who name was on the title,

Page 26

```
1   she was being sought by some law enforcement and she fled
2   the country.
3       Q. It was a Russian girl?
4       A. Yeah.
5       Q. Do you know anything about Ms. Wolf having deeded
6   away the property that she resided in to G & G Property
7   Investments, LLC?
8       A. I don't know anything about her doing that, no.
9   But I understand she deeded the property to somebody.
10      Q. Anybody ever complain to you about the fact after
11  she deeded away the property she continued to execute
12  mortgages on the property even though she didn't own it
13  anymore?
14      A. See, I didn't find out about the mortgage on the
15  property until after she fled because I never knew she
16  lived in a house around the corner.
17      Q. But what I'm asking is did anybody come and
18  complain to you and say -- or I don't know if you were
19  involved in that investigation at all. Did anybody
20  complain to you about the fact that even though she
21  already deeded away the property she continued to mortgage
22  the property?
23      A. And I remember that vaguely. As I was calling
24  the different lienholders that's how I found -- I talked
25  to a guy. Could his name be Steve?
```

Page 27

```
1       Q. Would it be Steve Wolberg?
2       A. Yeah, yeah, Steve Wolberg. I talked to him. He
3   was an attorney or something for some company.
4       Q. G & G Property Investments?
5       A. Oh, that's who it is? Well, he complained too.
6       Q. About what?
7       A. He said that something dealing with that
8   property. Something was wrong or something dealing with a
9   hotel that she quit-claimed to herself.
10      Q. That's a different piece of property.
11      A. Oh, okay.
12          Okay. But I talked to him and I think he was --
13  you know, I can't remember. I don't remember it because
14  everything I had I gave -- turned over to the FBI. But I
15  know somebody was complaining because she owed -- she had
16  a lot of liens on that property.
17      Q. Okay. So let me -- Okay. Just for purposes of
18  the record, going back to this, how certain are you that
19  Ms. Natalia Wolf fled the state of Florida prior to
20  October 18th, 2006?
21      A. How certain am I?
22      Q. Yeah.
23      A. Well, I don't know where she was. I just know
24  she wasn't in the house. I was told by a reliable source
25  later on that she caught a plane that next day on that
```

Page 28

```
1   Saturday that Sunday -- that Monday when I went to her
2   house. That previous night she was there. That morning
3   she fled.
4       Q. I'm not asking the question properly. As far as
5   you know prior to October 18th, 2006 Ms. Wolf was no
6   longer in the state of Florida physically; is that
7   correct?
8       A. No, not to my knowledge. Because I didn't call
9   the airport. I don't know. I was told she fled.
10      Q. Okay. But as far as you know she -- prior to
11  October 18th, 2006 she no longer resided in her house in
12  Eastern Shores?
13      A. Yeah, correct.
14      Q. Okay. So is it fair to say that to your
15  knowledge she moved out of that Eastern Shores house prior
16  to October 18th, 2006?
17      A. Yes.
18      Q. Okay. And since that date of October 18th, 2006
19  to the best of your knowledge Ms. Wolf has not been -- Let
20  me rephrase that.
21          To the best of your knowledge currently she is
22  not in the state of Florida?
23      A. Correct.
24      Q. Okay. And you tried to locate her physically
25  after October 18th, 2006 and have not been able to do so;
```

Page 29

```
1   is that correct?
2       A. Correct.
3       Q. And you have exhausted all means at your disposal
4   in trying to locate her physical -- current physical
5   address and location?
6       A. Correct.
7       Q. And still you have been unable to do so?
8       A. Correct.
9       Q. Do you know anything about an individual by the
10  name of Willard Geller?
11      A. No.
12      Q. What about a Gerald Geller?
13      A. No.
14      Q. What about -- You mentioned you believe you spoke
15  to a Mr. Steven Wolberg.
16      A. No, I spoke to him before.
17      Q. You spoke to him before that. Did you physically
18  meet Mr. Wolberg?
19      A. No.
20      Q. He called you?
21      A. He called, because apparently there was a hotel
22  in Hollywood that she deeded over to herself or quit-
23  claimed to herself and he had a concern about that.
24      Q. Do you know an individual by the last name of
25  Tesoriero?
```

30

1  A. No, I don't remember that.
2  Q. What about a Robert Kulikowski?
3  A. I don't remember that name either.
4  Q. What about a Carol Kay?
5  A. No, I don't remember.
6  Q. What about an entity by the name of -- bear with
7  me, let me look up the name -- Noril Realty, Inc.? Do you
8  know an entity by that name?
9  A. Who?
10 Q. Noril, N-o-r-i-l, Realty.
11 A. No, I don't remember that.
12 Q. And an attorney by the name of Donovan, last name
13 Donovan.
14 A. No, I don't remember that.
15 Q. Did you ever come into contact with an attorney
16 by the name of Ira Shapiro?
17 A. Ira Shapiro. That name sounds real familiar.
18 Ira Shapiro. I wonder if I ever met him. But I remember
19 his name. He was in -- He has an office in North Miami
20 Beach.
21 Q. He was an attorney for G & G Property
22 Investments, LLC.
23 A. I know how I know him now. I had a homicide case
24 and I had my victim's mother, she like 67 years old. Her
25 son was murdered, and that's all -- he took care of her.

31

1  She was refinancing her condo or selling her condo to some
2  Russian people in Sunny Isles, and Ira Shapiro, somehow he
3  was the closing agent.
4      And I knew of his name from being with this
5  company, you know. And we had -- I had to pay close
6  attention to him, which I'm glad I did because he was
7  getting ready to rip her off.
8  Q. Who, Ira Shapiro?
9  A. Yeah. He was overcharging her for something, and
10 the attorney who was helping the lady caught that. And he
11 said, oh, yeah, I will write a check. He wrote the lady a
12 check for the difference.
13 Q. How much was it?
14 A. I don't remember. I don't remember.
15 Q. Talking about a couple hundred or couple of
16 thousand?
17 A. Maybe a couple of thousand. But, you know, he
18 should -- Is he still in business?
19 Q. Um-hmm.
20 A. Oh, geez.
21 Q. How about an individual by the name of Leon
22 Goldstein? Are you familiar with that individual?
23 A. I have heard that name in this case before.
24 Q. But you never investigated him?
25 A. No.

32

1  Q. How about an individual by the name of Oleg
2  Firer? You ever met that individual before?
3  A. Yeah, I met him.
4  Q. Under what circumstances?
5  A. Well, I was advised by the Assistant State
6  Attorney's Office to take him in custody because there was
7  a warrant in the system for him. And apparently he was
8  involved with this house that Natalia used to live in, and
9  somehow he was getting -- trying to do a mortgage on that
10 house for like $3,000 I believe -- $3 million. And I
11 don't know who found out about that, but somebody said
12 they were doing a closing and it was conveyed to Aventura
13 and Aventura didn't want to get involved. So I contacted
14 the State Attorney's Office and Mr. Bill Kastruski
15 (phonetic), Bill K., he immediately got involved because
16 that deal didn't look good. And the closing was supposed
17 to happen. And I don't know. Bill K. did that.
18 Q. You were the physical arrest officer? You
19 physically arrested Mr. Oleg Firer?
20 A. Yes.
21 Q. During that arrest did he make any statements to
22 you?
23 A. Well, he didn't know what was going on.
24 Q. Meaning?
25 A. Well, he didn't know why I was arresting him.

33

1  Q. Oh, he didn't know why you were arresting him?
2  A. No. I told him there was a warrant in the system
3  for his arrest.
4  Q. And that is your only physical contact with
5  Mr. Firer?
6  A. Yes.
7  Q. Okay. Do you know an attorney or former attorney
8  by the name of Steven Goldstein?
9  A. No. I heard his name before also.
10 Q. How about an individual by the name of --
11 actually a company by the name of Trans-State Title?
12 A. Trans-State Title?
13 Q. Right.
14 A. No, I don't remember that.
15 Q. What about Fortune Mortgage?
16 A. I don't remember that one either.
17 Q. What about an individual or mortgage broker by
18 the name of Leon Atemnorod?
19 A. Never heard of that name.
20 Q. What about a Felix Vakhovsky?
21 A. I have heard his name before.
22 Q. But you never investigated him or met him?
23 A. No.
24 Q. So the bottom line is, detective, that you had a
25 limited initial role in investigating this matter and then

9 (Pages 30 to 33)

34

1 you transferred all the files to the federal authorities
2 because it became a federal matter?
3 A. Yes.
4 MR. GROYSMAN: All right. Thank you very much.
5 I have no further questions.
6 THE WITNESS: That's it?
7 MR. WINGER: Just ask you a couple of questions,
8 just a few.
9 THE WITNESS: I thought you objected.
10 MR. WINGER: They will be easy. It will be
11 painless.
12 CROSS EXAMINATION
13 BY MR. WINGER:
14 Q. My name is Brian Winger and I am representing the
15 Firers and G & G Properties in this case.
16 Have you ever heard of Pinnacle Three
17 Corporation?
18 A. Pinnacle Three? I don't remember.
19 Q. Did you actually perform an investigation into
20 Oleg Firer or were you just told by the State Attorney's
21 Office to take him into custody?
22 A. I didn't do an investigation. What happened is I
23 got a phone call that that house was being closed on,
24 somebody called, someone of interest -- that have interest
25 in the house. And we found out when the closing was going

35

1 to be and we contacted Aventura Police Department and they
2 weren't interested. So then contacted the State
3 Attorney's Office and Mr. Kastruski got involved and he
4 went over there and he found out that the funds wasn't
5 what Oleg suggested where he got his money from, so he did
6 a warrant.
7 I don't understand the technical part of it
8 because they did what they did. I didn't really open that
9 investigation up on that.
10 Q. Okay. Are you aware that the State Attorney's
11 Office eventually dropped all the charges against Oleg
12 Firer?
13 A. No, I'm not aware of that, no.
14 Q. Are you aware that Oleg Firer's criminal record
15 has been expunged?
16 A. No, I'm not aware of that.
17 MR. GROYSMAN: Is it expunged or sealed?
18 MR. WINGER: Expunged.
19 THE WITNESS: With the drop they wouldn't tell me
20 because it wasn't my investigation.
21 BY MR. WINGER:
22 Q. Okay. Have you ever arrested somebody on behalf
23 of the State Attorney's Office where the State Attorney's
24 Office subsequently drops the charges against that
25 individual?

36

1 A. Are you kidding me? I'm really supposed to
2 remember that?
3 Q. I mean in your experience.
4 A. I don't know. From what you are just telling me
5 now it just happened just recently with Oleg.
6 Q. Right, but has that ever happened with anybody
7 else?
8 A. I couldn't -- I don't recall. I'm certain it
9 has, but I don't remember.
10 MR. WINGER: Okay. I don't have any other
11 questions.
12 Got anything else?
13 MR. GROYSMAN: No, that's it.
14 MR. WINGER: Read or waive?
15 THE WITNESS: Don't matter. Really you didn't
16 have any questions.
17 (Off the record at 2:49 p.m.)
18 (An off-the-record discussion was held.)
19 (Back on the record at 2:50 p.m.)
20 MR. GROYSMAN: Let's go back on the record real
21 quick.
22 REDIRECT EXAMINATION
23 BY MR. GROYSMAN:
24 Q. Detective, I'm sorry, one final question. You
25 brought your documents here with you today?

37

1 A. Yes.
2 Q. What is that document?
3 A. That is the Incident Report 2006-1018-35.
4 Q. Is this a fair and accurate copy of the original
5 that's in the report?
6 A. Yes.
7 Q. Has anything been altered or deleted from this
8 copy from the original?
9 A. No.
10 Q. How did you obtain this?
11 A. I printed it at the station.
12 Q. You got it off your business records?
13 A. Yes.
14 Q. Was this incident report prepared in the normal
15 course of your investigative business?
16 A. Yes.
17 MR. GROYSMAN: Thank you. Can we just mark this
18 as Plaintiff's A.
19 (Plaintiff's Exhibit A was marked for
20 identification by the court reporter.)
21 (The deposition was concluded at 2:51 p.m.)
22 (Reading and signing of the deposition was waived
23 by the witness and all parties.)
24
25

10 (Pages 34 to 37)